

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

FEB 0 8 2002 **LF**

Michael N. Milby, Clerk

| | |
|---|---|
| **GARY GATES, MELISSA GATES,** § | |
| **INDIVIDUALLY, and as NEXT** § | |
| **FRIENDS TO SARAH GATES,** § | |
| **GARY WILTON GATES,** § | |
| **GEORGE GATES, SCOTT GATES,** § | |
| **DERODRICK GATES, TRAVIS** § | |
| **GATES, RAQUEL GATES,** § | |
| **CYNTHIA GATES, CASSANDRA** § | |
| **GATES, TIMOTHY GATES,** § | |
| **ANDREW GATES, ALEXIS GATES,** § | |
| **and MARCUS GATES** § | |
| Plaintiffs § | |
| § | |
| **v.** § | |
| § | |
| **TEXAS DEPARTMENT OF** § | |
| **PROTECTIVE AND REGULATORY** § | |
| **SERVICES, THOMAS CHAPMOND,** § | |
| **KAREN SHEEHAN, JERRY POLASEK,** § | |
| **AMY ODIN, SANDRA RUSSELL,** § | |
| **LISA MATTHEWS, LAUREL** § | |
| **MILLER, ERIKA DAVIS, SHERRECE** § | |
| **HAYWOOD, LAURA RAMIREZ,** § | |
| **FORT BEND COUNTY, FORT BEND** § | |
| **COUNTY SHERIFF'S DEPARTMENT,** § | |
| **MILTON WRIGHT, SAM MILLSAP,** § | |
| **ARTHUR CHAPMAN, CARLOS** § | |
| **CARRILLO, VIRGINIA SCHAFER,** § | |
| **KEN LEE, SCOTT PAGEL, FORT** § | |
| **BEND COUNTY DISTRICT** § | |
| **ATTORNEY'S OFFICE,** § | |
| **JOHN F. HEALEY, JR., KATHRYN** § | |
| **HOLTON, LAMAR CONSOLIDATED** § | |
| **INDEPENDENT SCHOOL DISTRICT,** § | |
| **MARSHA VOGELSANG, JUDY** § | |
| **O'NEAL, CYNTHIA BROWN,** § | |
| **KAREN KLEINE, FT. BEND COUNTY** § | |
| **CHILD ADVOCATES, INC., LINDA** § | |
| **SHULTZ, PAULA GIBSON, KORSEY** § | |
| **SMITH, and  BESSIE SMITH** § | |
| Defendants | |

**H- 02-0495**

**CIVIL ACTION NO.:**
**JURY TRIAL REQUESTED**

1

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE AND JURY OF SAID COURT:

### Parties

1.      Plaintiffs are individuals that are citizens of the Unites States and residents of the State of Texas.

2.      Defendant, Texas Department of Protective and Regulatory Services, Children's Protective Services (hereinafter "TDPRS" or "CPS"), a Texas State governmental entity, may be served with process by serving its Executive  Director, Thomas Chapmond, at 701 West 51st Street, Austin, Texas 78751.

3.      Defendant, Thomas Chapmond, an individual, may be served with process at 701 West 51st Street, Austin, Texas 78751.

4.      Defendant, Karen Sheehan, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

5.      Defendant, Jerry Polasek, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

6.      Defendant, Amy Odin, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

7.      Defendant, Sandra Russell, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

8.      Defendant, Lisa Matthews, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

9.      Defendant, Laurel Miller, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

10.     Defendant, Erika Davis, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

11.     Defendant, Sherrece Haywood, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

12.     Defendant, Laura Ramirez, an individual, may be served with process at 1110 Avenue G, Rosenberg, Texas 77471.

13.     Defendant, Fort Bend County, a county governmental entity in the State of Texas, may be served with process by serving Judge James C. Adolphus at 309 South 4th Street, suite 719, Richmond, Texas 77469.

14.     Defendant, Fort Bend County Sheriff's Department, a county governmental entity in the State of Texas, may be served with process by serving Sheriff Milton Wright at 1410 Ransom Road, Richmond, Texas 77469.

15.     Defendant, Milton Wright, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

16.     Defendant, Sam Millsap, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

17.     Defendant, Arthur Chapman, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

18.     Defendant, Carlos Carrillo, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

19.     Defendant, Virginia Schafer, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

20.    Defendant, Ken Lee, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

21.    Defendant, Scott Pagel, an individual, may be served with process at 1410 Ransom Road, Richmond, Texas 77469.

22.    Defendant, Fort Bend County District Attorney's Office, a county governmental entity in the State of Texas, may be served with process by serving John F. Healey, Jr., District Attorney, at 301 Jackson Street, Richmond, Texas 77469.

23.    Defendant, John F. Healey, Jr., an individual, may be served with process at 301 Jackson Street, Richmond, Texas 77469.

24.    Defendant, Kathryn M. Holton, an individual, may be served with process at 301 Jackson Street, Richmond, Texas 77469.

25.    Defendant, Lamar Consolidated Independent School District, a governmental entity in the State of Texas, may be served with process by serving Superintendent Thomas Randle at 3911 Avenue I, Rosenberg, Texas 77471.

26.    Defendant, Marsha Vogelsang, an individual, may be served with process at 3911 Avenue I, Rosenberg, Texas 77471.

27.    Defendant, Judy O'Neal, an individual, may be served with process at 7110 Greatwood Parkway, Sugar Land, Texas 77479.

28.    Defendant, Cynthia Brown, an individual, may be served with process at 3911 Avenue I, Rosenberg, Texas 77471.

29.    Defendant, Karen Kleine, an individual, may be served with process at 3911 Avenue I, Rosenberg, Texas 77471.

30. Defendant, Fort Bend Child Advocates, Inc., is a not-for-profit corporation that is incorporated under the laws of the State of Texas. Defendant has its principal place of business in the State of Texas. Defendant may be served with process by serving its registered agent, Linda Schultz, at 1505 Liberty Street, Richmond, Texas 77469.

31. Defendant, Linda Shultz, an individual, may be served with process at 1505 Liberty Street, Richmond, Texas 77469.

32. Defendant, Paula Gibson, an individual, may be served with process at 1505 Liberty Street, Richmond, Texas 77469.

33. Defendant, Korsey Smith, an individual, may be served with process at P.O. Box 450318, 700 W. Palm, Fresno, Texas 77245.

34. Defendant, Bessie Smith, an individual, may be served with process at P.O. Box 450318, 700 W. Palm, Fresno, Texas 77245.

### Capacity

35. Plaintiffs sue Thomas Chapmond in his official and individual capacities.

36. At the time of the occurrences at issue in this suit, Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez were officers of TDPRS and were acting in such capacity as agents, servants, and employees of TDPRS and were acting under the direction and control of TDPRS, and were acting under the direction and control of TDPRS, and were acting pursuant to either official policy, or the custom, practice, and usage of TDPRS.

37. Defendant CPS is a department of the State of Texas organized and existing under the laws of the State of Texas. In this cause, CPS acted through its agents, employees,

and servants, who were the policymakers for CPS and for the conduct of the persons employed by CPS and through Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez

38.     Plaintiffs sue Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez each in their individual and official capacities.

39.     At all times referred to herein, Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas and/or Fort Bend County, Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez and pursuant to their authority as officers of said CPS.

40.     At the time of the occurrences at issue in this suit, Defendants Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel were officers of the Fort Bend County Sheriff's Department and were acting in such capacity as agents, servants, and employees of Fort Bend County and its Sheriff's Department, and were acting under the direction and control of Fort Bend County and its Sheriff's Department, and were acting pursuant to either official policy, or the custom, practice, and usage of Fort Bend County and its Sheriff's Department.

41.     Defendant Fort Bend County is a municipal corporation organized and existing under the laws of the State of Texas. In this cause, Fort Bend County acted through its

agents, employees, and servants, who were the policymakers for Fort Bend County's Sheriff's Department and for the conduct of the officers employed by the Department, and through Defendants Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel.

42.     Plaintiffs sue Defendants Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel each in their individual and official capacities.

43.     At all times referred to herein, Defendants Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas, Fort Bend County, and the Fort Bend County Sheriff's Department and pursuant to their authority as officers of said Fort Bend County and Fort Bend County Sheriff's Department.

44.     At the time of the occurrences at issue in this suit, Defendants John F. Healey, Jr. and Kathryn Holton were officers of the Fort Bend County District Attorney's office and were acting in such capacity as agents, servants, and employees of Fort Bend County and its District Attorney's office, and were acting under the direction and control of Fort Bend County and its District Attorney's office, and were acting pursuant to either official policy, or the custom, practice, and usage of Fort Bend County and its District Attorney's office.

45.     Defendant Fort Bend County is a municipal corporation organized and existing under the laws of the State of Texas. In this cause, Fort Bend County acted through its agents, employees, and servants, who were the policymakers for Fort Bend County's

District Attorney's office and for the conduct of the officers employed by the Department, and through Defendants John F. Healey, Jr., and Kathryn Holton.

46.     Plaintiffs sue Defendants John F. Healey, Jr., and Kathryn Holton each in their individual and official capacities.

47.     At all times referred to herein, Defendants John F. Healey, Jr., and Kathryn Holton acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas, Fort Bend County, and the Fort Bend County District Attorney's office and pursuant to their authority as officers of said Fort Bend County and Fort Bend County District Attorney's office.

48.     At the time of the occurrences at issue in this suit, Defendants Marsha Vogelsang, Judy O'Neil, Cynthia Brown, and Karen Kleine were employees of the Lamar Consolidated Independent School District ("LCISD") and were acting in such capacity as agents, servants, and employees of LCISD, and were acting under the direction and control of LCISD, and were acting pursuant to either official policy, or the custom, practice, and usage of LCISD.

49.     LCISD is a municipal corporation organized and existing under the laws of the State of Texas. In this cause, LCISD acted through its agents, employees, and servants, who were the policymakers for LCISD and for the conduct of the persons employed by LCISD, and through Defendants Marsha Vogelsang, Judy O'Neil, Cynthia Brown, and Karen Kleine.

50#.    Plaintiffs sue Defendants Marsha Vogelsang, Judy O'Neil, Cynthia Brown, and Karen Kleine each in their individual and official capacities.

51.     At all times referred to herein, Defendants Marsha Vogelsang, Judy O'Neil,

Cynthia Brown, and Karen Kleine acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas and LCISD and pursuant to their authority as employees of said LCISD.

52.    At the time of the occurrences at issue in this suit, Defendants Linda Shultz and Paula Gibson were employees of Ft. Bend County Child Advocates, Inc. and were acting in such capacity as agents, servants, and employees of Ft. Bend County Child Advocates, Inc., and were acting under the direction and control of Ft. Bend County Child Advocates, Inc., and were acting pursuant to either official policy, or the custom, practice, and usage of Ft. Bend County Child Advocates, Inc.

53.    Ft. Bend County Child Advocates, Inc. is a not-for-profit corporation that is incorporated under the laws of the State of Texas. In this cause, Ft. Bend County Child Advocates, Inc. acted through its agents, employees, and servants, who were the policymakers for Ft. Bend County Child Advocates, Inc. and for the conduct of the persons employed by Ft. Bend County Child Advocates, Inc. and through Defendants Linda Shultz and Paula Gibson. Ft. Bend County Child Advocates, Inc. served as an investigative arm or tool of a state agency under color of law, and is thus subject to 42 U.S.C. § 1983.

54.    Plaintiffs sue Defendants Linda Shultz and Paula Gibson each in their individual and official capacities.

55.    At all times referred to herein, Defendants Linda Shultz and Paula Gibson acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas and Ft. Bend County Child Advocates, Inc. and pursuant to their authority as employees of said Ft. Bend County Child Advocates, Inc.

56.     Plaintiffs sue Korsey Smith and Bessie Smith in their individual capacities.

### Jurisdiction

57.     This court has jurisdiction to hear and determine this action based upon violations

of the Fourth and Fourteenth Amendments to the United States Constitution, federal civil

rights law pursuant to 42 U.S.C. §§ 1983 and 1988, federal statutes, and Texas statutory

and/or common law. The court has jurisdiction of this action under 42 U.S.C. § 1983, 28

U.S.C. § 1343, and 28 U.S.C. §1331.

### Conditions Precedent

58.     All conditions precedent have been performed or have occurred.

### Facts

59.     This is an action for money damages and for prospective relief against the

Defendants named above, for violations of the Fourth and Fourteenth Amendments to the

United States Constitution, federal civil rights law pursuant to 42 U.S.C. §§ 1983 and

1988, the Texas Constitution, and Texas statutory and/or common law.

60.     Plaintiffs GARY GATES ("Mr. Gates") and MELISSA GATES ("Mrs. Gates")

have thirteen children, eleven of which are adopted. Four of those children were adopted

through the Defendant Texas Department of Protective and Regulatory Services, Child

Protective Services division ("CPS"), which had done a thorough home study and

background check of Mr. and Mrs. Gates before the events at issue in this case. CPS was

thus aware of and had extensive records of Mr. and Mrs. Gates' parenting skills and

disciplinary methods, as well as knowledge of the problems of some of the children.

61.     Two of the children adopted through CPS, Plaintiffs Scott Preston Gates ("Scott")

and Travis Glenn Gates ("Travis") were classified by Lamar Consolidated Independent

School District ("LCISD") as "special education" students. Mr. Gates began to have serious concerns about Scott and Travis' education. He had innumerable meetings and correspondence, formal and informal, with various teachers, counselors, and administrators in an effort to resolve these issues. On February 10, 2000, Mr. Gates had one of several Admissions/Review/Dismissal ("ARD") meetings with LCISD officials. The meeting was quite heated, and Mr. Gates made it clear that he would go further to protect his son.

62.     Travis suffers from "attachment disorder," an official diagnosis listed in the *Diagnostic and Statistical Manual IV, Revised,* used by mental health practitioners. As an infant, Travis had been repeatedly left for long periods of time in his crib with no food and without basic care. He had developed responses such as stealing and eating massive quantities of food, even scrounging for food in trash receptacles or scraping it from the bottom of his shoes. Both LCISD and CPS were aware that Travis had this disorder. As a result of the disorder, Travis had to be closely monitored to prevent injury to himself by engorging massive quantities of food. Mr. Gates had, on numerous occasions, verbally and in writing informed employees of Defendant LCISD of Travis' physical and emotional disorders/problems, and that he was working with a psychologist to overcome these problems. He encouraged employees of LCISD to call him with any questions regarding same.

63.     On or about February 10, 2000, Travis "acted out" his eating disorder by taking large quantities of food from the family kitchen without permission.  He then sneaked into the attic to eat the food. He repeatedly lit matches to see in the dark, and threw them down into the paper-lined insulation when they burned down, creating a serious fire

11

hazard in the exposed-wood attic. When Mr. Gates became aware of this activity, and the danger it posed not only to Travis but to the entire family, he knew he had to make Travis aware of how serious it was.

64.     On February 11, 2000, Mr. and Mrs. Gates put the food wrappers in a "baggie" and attached it to Travis' shirt, instructing Travis to wear it to school. Travis' response was the first demonstration of sincere remorse Mr. and Mrs. Gates had ever seen from him – an important milestone in helping him overcoming his compulsion. Mr. Gates wrote a note to the school explaining why Travis was to wear the baggie on his shirt for the day. (Travis was in a controlled school environment with only five other "special needs" students.) He included his office and cellular phone numbers on the note in case teachers or administrators wanted to discuss the matter.

65.     Rather than contact Mr. or Mrs. Gates, Defendant Judy O'Neal ("O'Neal"), a LCISD administrator, removed the baggie from Travis' shirt. O'Neal then held a meeting with Defendant Cynthia Brown ("Brown") and other employees of LCISD to discuss calling CPS. Then, despite the extensive information in the LCISD files regarding Travis' compulsive eating disorder, and the note from Mr. Gates offering to discuss the matter, O'Neal called CPS and made outrageous and untrue allegations of physical and emotional abuse against Mr. Gates. (Exhibit A). The allegation also stated that Mr. Gates was "very religious." It was no coincidence that this action was taken the day after the ARD confrontation.

66.     In response to the call from LCISD, Defendant Erika Davis ("Davis"), an agent of CPS, went to the school and interrogated Travis without counsel or parents present. Davis then removed Travis from school and took him to the Defendant Ft. Bend County Child

Advocates, Inc. ("Child Advocates") Child Advocacy Center and video-taped an interrogation of Travis. That afternoon, Mr. Gates received a phone call from Davis, who informed him CPS needed to interview his young children. Mr. Gates refused to allow that, and offered to come to her office to discuss the problem. Davis gave him directions and he arrived at approximately 2:00 p.m. After a brief meeting, Davis told him to wait in the building's lobby.

67.     Mr. Gates waited in the lobby until 3:30 p.m., when he received a call on his cell phone from his son, Plaintiff Derodrick Gates ("Derodrick"), who told Mr. Gates that he was in Mr. Gates' room at their home, hiding under the bed, with the door locked. In a fearful, panicked voice, he stated that CPS agents and police had followed his school bus home, followed him into the house, and began asking a lot of questions. Derodrick informed Mr. Gates that Mrs. Gates was not home, and asked Mr. Gates what he should do. Mr. Gates told him that he would arrive home in a few minutes. Mr. Gates immediately left the TDPRS lobby and drove to his home.

68.     When Mr. Gates arrived home, there were five CPS agents in his house, interrogating his youngest children. Mrs. Gates was not home, and the children were being watched by a housekeeper, who had not given anyone permission to enter the house. (Mr. Gates later found out the CPS workers and Fort Bend County Deputy Sheriffs did not even ask permission to enter the house.) By the time Mr. Gates arrived, the deputies had departed.

69.     Defendant Amy Odin ("Odin"), a CPS agent, informed Mr. Gates that an allegation of child abuse had been made against him. Mr. Gates asked for Odin's warrant, and stated that she could not just walk into his home and interrogate his children without

13

his consent or a warrant. Odin replied, "Yes, we can" and called Defendant Fort Bend County Sheriff's Department for "backup." Odin told the sheriff's department that "the father has arrived home." The deputy sheriffs arrived almost immediately, and Defendant Deputy Arthur Chapman removed Mr. Gates to the porch of his house. Deputy Chapman told him that the CPS agents were going to interrogate his children in his home, and that there was nothing Mr. Gates could do about it. He was informed that he would be confined to his front porch, and that if he was not quiet, he would be placed in a patrol car. He was warned that if he "continued to protest" what was going on, "he knew what would happen next." When Mr. Gates and his pastor, who had arrived shortly before, asked if he could at least be allowed in a separate room of the three story, 5,000 square foot house, Deputy Chapman's initial response was that he would not allow Mr. Gates to decide what he did or didn't want to do. However, after further discussion, he finally confined Mr. Gates to a room in his house. However, he assumed a position at the only entrance to the room and prevented Mr. Gates from moving about or leaving.

70.    Mr. Gates asked if he could at least speak with his children, and stated that he still did not even know why the CPS agents and sheriff's deputies were there. Odin informed him that they were investigating a report of child abuse, and that they were trying to find out whether any of the other children were "in danger." Odin went on to state that they had a legal right to do what they were doing.

71.    The five CPS agents separated the children and were interrogating them about how Mr. and Mrs. Gates treated them, what kind of discipline was used, whether anyone used drugs, alcohol, or tobacco, and other penetrating questions. The vast majority of the questions had no relationship to Travis' issues.

14

72.     About 5:15 p.m., Mrs. Gates arrived at the house, unaware of what was taking place. Seeing the Sheriff's and other vehicles, she immediately feared that one of the children had been injured. As she rushed to the house, she was intercepted by Defendant Laurel Miller, a CPS agent who, despite Mrs. Gates' pleas and protests, refused to allow her into her own home, and refused to allow her to see her husband or her children. Mr. Gates was also kept confined and prevented from joining his wife. Mrs. Gates pleaded with Miller to tell her what was going on, but Miller would only tell her it was a child abuse investigation. Mrs. Gates was questioned by agent Miller while some of her children, confined to the house, pressed their faces against a window trying to establish contact with their mother. Eventually, Miller finished her questioning and allowed Mrs. Gates into the house, where she was able to join her husband. She was still prevented from having any contact with the children.

73.     At about this time, Deputy Chapman stated to Mr. Gates' pastor, "I don't know why we're even here."

74.     Pastors Keith Bower and Brent Burkhart, from the Gates' church, approached some of the officers at the scene and pleaded with them to listen to the pastors and to other members of the church that had gathered on the front lawn. Pastor Bower explained to them that the Gates family had belonged to the church for years, and that the family is well known to Bower and his wife and to many of the church members. The pleas were ignored.

75.     Sometime after 6:00 p.m., Mr. and Mrs. Gates asked if they could feed their children. The CPS agents, who had shown no interest in whether or not the children had any dinner, allowed Mrs. Gates to order a pizza. Mr. and Mrs. Gates were allowed to eat

dinner with their children. After dinner, the younger children were taken upstairs and prepared for bed. Wherever Mrs. Gates went, she was followed by a female deputy sheriff.

76.     Suddenly, well after dark, Defendant Sam Millsap ("Millsap"), a Sergeant with the Fort Bend County Sheriff's Department, stormed into the Gates home with more deputies and screamed in a loud, harsh voice: "THE JAIL WAGON IS HERE. GET THESE KIDS LOADED UP AND OUT OF HERE! NOW!" The children began screaming and crying. When Mr. Gates asked what was going on, Sergeant Millsap, roughly and with excessive force, shoved Mr. Gates against a wall, pressed his large metal flashlight against Mr. Gates' chest, and said, again in a loud and harsh voice, "IF YOU GIVE ME ANY TROUBLE I'M GONNA THROW YOU IN JAIL. I'M NOT GONNA PUT UP WITH ANYTHING FROM YOU. DO YOU UNDERSTAND ME?" Mr. Gates asked if he could talk to his children. Millsap refused, and again threatened to take him to jail.

77.     Pastor Burkhart then asked if Mr. and Mrs. Gates could at least get clothes for the children and say goodbye to them. Many of the children had changed into pajamas and did not have shoes on. Sergeant Millsap snapped back that they had "tied up" half his office for the entire afternoon, and that he had "had enough." He again told the other deputies to load up the children into the jail wagon, "NOW!" Mr. Gates then asked Sergeant Millsap for his name. Millsap strutted over to him, stood over him in a menacing manner, and spelled out his name, very slowly and loudly.

78.     Pastor Bower then asked the CPS agents if the children could be taken to the homes of church members. This request was flatly refused, because "it would not be in

the best interest of the children." Instead, the children were herded to the door. One of the deputies asked Sergeant Millsap whether the children should be placed in the jail wagon without their shoes. (It was February.) Sergeant Millsap then allowed Mr. and Mrs. Gates to gather shoes and clothing for the children.

79.     Mrs. Gates asked agent Odin for permission to explain to Sarah, her mentally-handicapped daughter, what was happening. Sarah has the approximate mental capacity of a four year old. Odin refused, and brought over a deputy to place himself between the mother and child. As the deputies herded the children into the jail wagon, Sarah began struggling and screaming for her mother and for her doll. The smaller children were crying as well. The older children looked confused, and pleaded with their father to help them. They asked if they were going to jail. Marcus Gates, age four, grabbed his father's leg, crying uncontrollably. A deputy pulled the child away and took him to the jail wagon. Sergeant Millsap sarcastically suggested to Pastor Bower that he "pray" for the children. The rest of the crying children were finally forced into the jail wagon, the doors were slammed closed, and the jail wagon drove away, as the children looked out the barred windows.

80.     Mrs. Gates frantically told the CPS agents that several of her children were on medication. She assembled the medications and wrote down the dosage instructions for each child while under duress.

81.     As the rest of the CPS agents were leaving, Odin gave the Gates a "Notice of Emergency Removal of Children." (Exhibit B). The notice stated that the Defendant Texas Department of Protective and Regulatory Services had taken custody of the children, pursuant to Texas law, because "the child's [sic] physical health or safety was in

immediate danger" and that "there was no time to obtain an emergency court order before the removal." In a space on the form labeled "facts that led us to believe the child [sic] should be taken into custody," Odin listed allegations instead of facts. The allegations were later proven unfounded.

82.      CPS workers directed the jail wagon driver to the CPS offices in Rosenberg. There, the children were unloaded and interrogated again, as CPS caseworkers got on telephones to try to find enough foster homes for 13 children. The Gates children were scattered around Fort Bend County in foster homes. One set of foster parents, Defendants Korsey and Bessie Smith, approved by CPS, told Plaintiffs Scott Gates, Travis Gates, Derodrick Gates, and Raquel Gates that their parents did not care about them, that their parents would not fight for them, and that they were never going to see their parents again - that none of the kids in "this situation" ever see their parents again. The Smiths were warned by three of the Gates children that Travis had a compulsive eating disorder and had to have his food intake closely monitored. However, the Smiths ignored this information, and Travis was given unlimited access to food. He gorged himself to the point of being physically overweight. CPS removed Travis from a loving family dealing with this problem and placed him in an environment where no one cared, without informing the foster parents about his compulsive eating disorder.

83.      CPS also sent an agent to remove the Gates' oldest child, Gary Wilton Gates ("Will") from a National Honor Society Valentine's Day dance he was attending at his school.

84      Despite pleas from Will Gates to have Plaintiff Sarah Gates, his mentally-handicapped sister, placed in a foster facility with him so that he could take care of her,

18

CPS officials took her to a separate facility, away from the other children. When she was returned to the Gates, her underclothing was soiled, her hair was greasy, and she had body odor. To this day, Sarah has a violent reaction whenever she hears anyone say "CPS."

85.     Plaintiffs Will and George Gates were placed in a home with heavy smokers. They were unaccustomed to tobacco smoke, which make the experience extremely unpleasant. Will reported that they were yelled at by the foster caregivers, who did nothing but smoke and watch television. George described the foster mother as an "angry witch."

86.     Plaintiffs Cynthia Gates, T.J. Gates, Marcus Gates and Alexis Gates were placed in a foster home that was broken into and burglarized while they were there.

87.     That weekend, Mr. Gates spent $15,000 to retain legal counsel to help him get his children back from CPS.

88.     On February 14, 2000, the Defendant Fort Bend County District Attorney's Office filed a petition in the 328th Judicial District Court of Fort Bend County, Texas seeking to terminate the parental rights of Mr. and Mrs. Gates. (Exhibit C). The petition, signed by Defendant Kathryn M. Holton, Assistant District Attorney, identified the Defendant Texas Department of Protective and Regulatory Services as the petitioner. Paragraph 7 of the petition states that "Pursuant to 42 U.S.C. §§ 671(a)(15) and 672(a)(1), the Department made reasonable efforts, consistent with the children's health and safety, to prevent or eliminate the need for removal of the children from the home and to make it possible for the children to safely return to the children's home, but continuation in the home would be contrary to the welfare of the children."

89.     Paragraph 8 of the petition states that "[t]here is a continuing danger to the physical health or safety of the children if returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian who is presently entitled to possession of the children. The nature of the emergency and the continuing danger to the welfare of the children make efforts to allow the children to remain with or return to the person entitled to possession of the children impossible or unreasonable."

90.     Paragraph 9 of the petition asks the District Court to "immediately, without notice or an adversary hearing, appoint the Department as temporary managing conservator of the children." Paragraph 13 seeks the termination of Melissa Gates' parental rights, and paragraph 14 seeks termination of Gary Gates' parental rights, "if reunification with the parent cannot be achieved."

91.     Even though the 328th District Court ordered the return of the children, CPS and the District Attorney's office continued to prosecute their termination suit for over seven (7) months. On April 10, 2000, CPS informed Mr. and Mrs. Gates that a "completed" investigation found that they had been "responsible" for a total of 36 counts of neglect, physical abuse, and emotional abuse of their children. (Exhibit D).

92.     Subsequent to this "completed investigation," a court-ordered social study was done on the Gates home by a professional social worker not connected with, but approved by, CPS. (Exhibit E). The 25-page report found that "Melissa and Gary Gates are loving, caring parents who have shown ample evidence that they are able and willing to commit their personal time and resources towards seeking the help of experts, friends, and spiritual counselors, in order to gain and secure the best quality of life possible for all of their children." The report further stated that "this family needs to be free from the fear

that, at any given moment, the life they have developed together (with God's help) through mutual respect and love for each other, could be shattered once again." The report concluded that "[t]herefore, it is recommended that no further court-mandated services are needed for the Gates family at this time. Additionally, it is doubtful that the Gates will trust the present staff of Ft. Bend County Protective Services in the near future, and keeping the case open is a painful reminder of the trauma in their family. Hopefully, that state government agency will determine that taking action to close the Gates' active file at this time, will be in the best interest of the entire family."

93.     On June 22, 2000, Jay P. Bevan, Ph.D., a clinical psychologist agreed upon by both CPS and the Gates, issued his court-ordered "psychological evaluation" report on all 15 members of the Gates family (Exhibit F). In his summary and recommendations (p.22), Dr. Bevan wrote that Gary and Melissa Gates were "creative, caring, very devoted parents. They have an amazing ability to appreciate the individual needs of each of their thirteen children; they understand that each child is unique and needs individualized parenting intervention. The Gates have availed themselves repeatedly of professional assistance when they deemed it necessary, and have been open to input from these professionals. They derive a remarkable amount of support from their religious beliefs and a tremendous amount of social support from a large and caring Christian community. I have never said this about anyone I have ever evaluated: I admire the Gates. I would not hesitate to place my own children in their care. The Gates have no need for CPS or CASA services. Despite these reports, CPS never retracted or modified their findings.

94.     There exists a realistic probability that absent prospective relief, the Gates family will continue to suffer at the hands of Defendants LCISD, CPS, Child Advocates, and the

Fort Bend County District Attorney's office. This was first made clear on September 26, 2000, when the Fort Bend County District Attorney's office filed a response to a motion for sanctions in the parental rights termination suit. The response contained the following statement: **"A monitoring system has been set up within the community to observe the family and, hopefully, keep the children safe. Regardless of the manner in which this case has been resisted by Mr. and Mrs. Gates, enough attention has been drawn to their children that the Department can expect the community to do its part to keep the children safe."** The following day, the D.A.'s office filed a motion to nonsuit the parental termination case on behalf of their client, CPS.

95.     Less than four months later, the significance of this incredible statement became apparent when Defendant LCISD reported to Defendant CPS that they suspected child abuse against Alexis Gates, age 6. They found a small contusion on her cheek. Alexis was picked up by Defendant CPS and taken to the Child Advocacy Center, run by Defendant Ft. Bend County Child Advocates, Inc., where she was interrogated. She told the interrogators that she bruised her cheek on a bed headboard while playing with her brothers, Marcus and Derodrick. CPS returned Alexis to her family, but insisted on interrogating the boys. Mr. Gates refused their demand, whereupon, for the first time, CPS actually obtained a court order to "interview" the children. To get the order, CPS misrepresented to the court that Alexis had accused her father of abuse.

96.     When Marcus and Derodrick were interrogated by Defendant Ft. Bend County Child Advocates, Inc., the interrogator attempted to show material offensive to the boys, and asked them questions about their "private parts." However, the older boy refused to participate in this exercise, finding it offensive and "nasty." When the interrogator asked

Marcus if he was afraid of anything, he said "CPS." The interrogator was unable to get either child to make any sort of statement that even suggested abuse, and both boys were returned to Mr. and Mrs. Gates.

97.     The Gates family spent a total of over $80,000 in legal expenses defending themselves in the seven month lawsuit to terminate their parental rights. To date, their total expenses in their legal fight against Defendants has amounted to over $250,000 spent on defending themselves and trying to clear their names. It continues to rise.

### Count # 1 - Unlawful Retaliation Cognizable Under 42 U.S.C. § 1983

98.     Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

99.     The conduct of Defendants Marsha Vogelsang, Judy O'Neal, Cynthia Brown and Karen Kleine, acting individually and in conspiracy, as set forth above, was a direct result of their personal animus toward Plaintiff Gary Gates and/or as retaliation for Mr. Gates' refusal to ignore serious problems with how his children were being "educated," as well as his obvious intention to file a petition seeking an administrative hearing regarding same. Defendant LCISD employees were well aware that if Defendant CPS removed Plaintiff Travis Gates from the Gates home, he would be placed in a different school, and thus become "someone else's problem." The day after the confrontational ARD proceeding, Defendants conspired to report Plaintiff Gary Gates to Defendant CPS for child abuse. In the report, Defendants lied about the facts and misrepresented critical matters. As such, Defendants' actions were an unlawful and malicious attempt, under color of law, to harass, intimidate, and punish Plaintiffs. The fact that the entire process

was repeated a year later with another Gates child is further evidence of Defendants' abuse of Plaintiffs' procedural and substantive due process rights under color of law.

100.    The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

101.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 2 – Unlawful Search and Seizure Without Probable Cause by Fort Bend County Sheriff's Deputies

102.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

103.    As a direct and proximate result of the raid on Plaintiffs' home as set forth above, Plaintiffs suffered and continue to suffer severe mental anguish and emotional trauma in connection with the deprivation of their constitutional rights guaranteed them by the Fourth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

104.    Defendants Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant, and in failing to take any steps to confirm the validity of information provided them by CPS agents when they had reason to doubt the validity of such information.

105.    As a result of Defendants' acts as described above, Defendants deprived Plaintiffs of their right to be free from unlawful searches and seizures, in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States.

106.    As a direct and proximate result of the Defendants' actions as described above, Plaintiffs suffered damages and will suffer additional damages in the future in an amount that cannot yet be determined.

107.    The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

108.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

109.    Prior to the incidents at issue in this case, Sheriff Milton Wright knew of previous incidents involving Defendants wherein deputies acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant, and in failing to take any steps to confirm the validity of information provided them by CPS agents when they had reason to doubt the validity of such information. Sheriff Milton Wright took no action to discipline Defendants or other deputies or to order them not to repeat such incidents, thus tacitly authorizing such conduct. If Sheriff Milton Wright had previously taken such remedial action, the unlawful violation of Plaintiffs' constitutional rights would not have occurred.

110.    Fort Bend County, Texas is vested by state law with the authority to make and/or approve policy for the Fort Bend Sheriff's Department on the practice of searches and seizures. The County Commissioners were aware of a pattern of unlawful searches by sheriff's deputies employed by Fort Bend County; they were aware that the county's policies regarding the discipline of deputies accused of unlawful searches was so inadequate that it was obvious that a failure to correct them would result in further

incidents of unlawful searches; and the failure to correct said policies caused the unlawful search to be forced upon Plaintiffs as set forth above. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

111.    At all times relevant to this complaint, Defendants, as Fort Bend County Sheriff's Deputies, were acting under the direction and control of Sheriff Milton Wright and of Fort Bend County, and were acting pursuant to the official policy, practice, or custom of Fort Bend County.

112.    Acting under color of law and pursuant to official policy, practice, or custom, Milton Wright and Fort Bend County intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, Defendants in their duties to refrain from unlawfully and maliciously conducting such clearly unconstitutional acts against Plaintiffs.

113.    Acting under color of law and pursuant to official policy, practice, or custom, Sheriff Milton Wright and Fort Bend County intentionally, knowingly, and recklessly failed to instruct, train, and supervise Defendants on a continuing basis in the correct procedure for assisting CPS in investigations and seizures. .

114.    Sheriff Milton Wright and Fort Bend County had knowledge, or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about to be committed. Sheriff Milton Wright and Fort Bend County had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly, or recklessly failed

or refused to do so. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

115.    Milton Wright and Fort Bend County directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants heretofore described.

116.    As a direct and proximate result of the acts of Sheriff Milton Wright and Fort Bend County as set forth herein, Plaintiffs suffered severe mental anguish in connection with the deprivation of their constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and protected by 42 U.S.C. § 1983.

117.    The acts of Sheriff Milton Wright as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendant in his individual capacity.

118.    As a direct and proximate result of the raid on Plaintiffs' home as set forth above, Plaintiffs suffered and continue to suffer severe mental anguish and emotional trauma in connection with the deprivation of their constitutional rights guaranteed them by the Fourth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## Count # 3 – Excessive Force

119.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

120.    As a direct and proximate result of the aforedescribed unlawful and malicious physical abuse of Plaintiffs by Defendant Millsap and others, committed under color of law and under their authority as Fort Bend County sheriff's deputies, Plaintiffs suffered

harm and were deprived of their right to be secure in their persons, against unreasonable seizure of their persons and the use of excessive force, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

121.    As a direct and proximate result of the malicious and outrageous conduct of Defendant Millsap and others as set forth above, Plaintiffs suffered pain, anguish, fear, and consternation.

122.    The acts of Defendant Millsap and others as aforementioned were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against Defendants in their individual capacities.

123.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 4– Unlawful Search and Seizure Without Probable Cause by CPS Agents

124.    Defendants Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant or order, and in failing to take any steps to confirm the validity of information provided them by the confidential informant when they had reason to doubt the validity of such information, based on their own files and the interrogation of Travis Gates by Defendant Fort Bend County Child Advocates, Inc. They also deliberately failed to examine any of the available exculpatory evidence in the LCISD files at the school where Travis was picked up.

125.    As a result of Defendants' acts as described above, Defendants deprived Plaintiffs of their right to be free from unlawful searches and seizures, in violation of the Fourth Amendment to the Constitution of the United States.

126.    As a direct and proximate result of the Defendants' actions as described above, Plaintiffs suffered damages and will suffer additional damages in the future in an amount that cannot yet be determined.

127.    The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

128.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

129.    Prior to the incidents at issue in this case, Thomas Chapmond and Karen Sheehan knew of previous incidents involving Defendants or other CPS agents, wherein those CPS agents acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant or order, and in failing to take any steps to confirm the validity of information provided them by a confidential informant when they had reason to doubt the validity of such information. Chapmond and Sheehan took no action to discipline Defendants or other CPS agents, or to order them not to repeat such incidents, thus tacitly authorizing such conduct. If Chapmond or Sheehan had taken such remedial action, the unlawful procedures would not have occurred.

130.    CPS is vested by state law with the authority to make policy on the practice of child abuse investigations. CPS was aware of a pattern of unlawful investigations and seizure of children without due process, when due process was available, by workers

employed by CPS; they were aware that the policies regarding the discipline of workers accused of such unlawful practices was so inadequate that it was obvious that a failure to correct them would result in further incidents of unlawful searches; and the failure to correct said policies caused the unlawful procedures to be forced upon Plaintiffs as set forth above. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

131.    At all times relevant to this complaint, Defendants, as CPS employees, were acting under the direction and control of Thomas Chapmond and Karen Sheehan and of CPS, and were acting pursuant to the official policy, practice, or custom of CPS.

132.    Acting under color of law and pursuant to official policy, practice, or custom, Thomas Chapmond and Karen Sheehan and CPS intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, Defendants in their duties to refrain from unlawfully and maliciously conducting an illegal search and seizure against Plaintiffs.

133.    Acting under color of law and pursuant to official policy, practice, or custom, Karen Sheehan and CPS intentionally, knowingly, and recklessly failed to instruct, train, and supervise Defendants on a continuing basis in the correct procedure for conducting a lawful investigation of alleged child abuse.

134.    Thomas Chapmond, Karen Sheehan and CPS had knowledge, or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about to be committed. Karen Sheehan and CPS had power to prevent or aid in preventing the commission of said wrongs, could have done so by

reasonable diligence, and intentionally, knowingly, or recklessly failed or refused to do so. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

135.    CPS directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants as set forth above.

136.    As a direct and proximate result of the acts or omissions of Thomas Chapmond, Karen Sheehan and CPS as set forth herein, Plaintiffs suffered mental anguish in connection with the deprivation of their constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and protected by 42 U.S.C. § 1983.

137.    The acts of Thomas Chapmond and Karen Sheehan as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacity.

### Count # 5 –Interference with Family Relationships

138.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

139.    As a direct and proximate result of the unlawful, deliberately indifferent, and malicious acts of Defendants Polasek, Odin, Russell, Matthews, Miller, Davis, Haywood, Ramirez, Millsap, Chapman, Carrillo, Schafer, Lee, and Pagel, as set forth above, and as a direct and proximate result of established policies and customs of CPS and Fort Bend County as set forth above, Plaintiffs were deprived of their right to the services, consortium, companionship, comfort, and support of their children/parents/siblings without due process of law, in violation of their rights under the Fourteenth Amendment to the United States Constitution to live together as a family.

140.   If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 6 - Removing Child from Parental Custody Without Hearing

141.   Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

142.   As a direct and proximate result of the unlawful, deliberately indifferent, and malicious acts and omissions of Defendants CPS, Chapmond, Sheehan, Polasek, Odin, Russell, Matthews, Miller, Davis, Haywood, Ramirez, Millsap, Chapman, Carillo, Schafer, Lee, Pagel, Wright, Fort Bend County and the Fort Bend County Sheriff's Department, Plaintiffs Gary and Melissa Gates were deprived of their liberty without due process of law in contravention of the Fourteenth Amendment of the United States Constitution as a result of the failure of the Defendants to afford Plaintiffs a hearing regarding the decision to remove Plaintiffs' children from Plaintiffs' custody.

143.   If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 7 - Intentional Infliction of Emotional Distress

144.   Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

145.   The conduct of Defendants CPS, Chapmond, Sheehan, Polasek, Odin, Russell, Matthews, Miller, Davis, Haywood, Ramirez, Wright, Millsap, Chapman, Carillo, Shafer, Lee, Pagel, Fort Bend County, Fort Bend County Sheriff's Department, Healey, Horton, and the Fort Bend County District Attorney's office was extreme and outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious and intolerable in a civilized community. In particular, the conduct was outrageous because Defendants, despite possessing no evidence to support allegations of child abuse or neglect, and despite possessing evidence to refute allegations

32

of child abuse or neglect, nonetheless forcibly removed Plaintiffs' thirteen children from their home and attempted through legal action to terminate Plaintiffs' parental rights to their thirteen children. The Plaintiff children were subjected to extreme fear and anxiety, in addition to unsafe conditions. Defendants have stated that they continue to monitor this family.

146.    The Defendants' conduct proximately caused Plaintiffs damage in that it caused Plaintiffs to suffer severe emotional distress. In particular, the Defendants' conduct was the direct and proximate cause of severe disappointment, indignation, wounded pride, shame, despair, and public humiliation in that Plaintiffs were deprived of their children, threatened with the permanent loss of their children, and falsely portrayed as perpetrators of child abuse/neglect to the community. Defendants have made Plaintiffs the subject of monitoring activity, and have made Plaintiffs the object of gossip and rumor in the community at large.

147.    In addition to emotional distress, Plaintiffs have suffered and will continue to suffer additional damages as a proximate result of the Defendants' conduct in that, in all reasonable probability, Plaintiffs will continue to suffer this mental pain and anguish for a long time into the future. Plaintiffs have also incurred damages in the form of attorney's fees to defend against Defendants' conduct and to try to clear their name.

148.    Defendants' conduct as set forth above was malicious and fraudulent so as to entitle Plaintiffs to recover exemplary damages. In this connection, Plaintiffs will show that as a result of Defendants' conduct, Plaintiffs have suffered losses of time and other expenses, including attorney's fees incurred in the investigation and prosecution of this action. Accordingly, Plaintiffs ask that exemplary damages be awarded against the Defendants in a sum within the jurisdictional limits of this Court.

## Count # 8 - Assault and Battery (Infliction of Bodily Injury and Offensive Physical Contact)

149.   Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

150.   As a direct and proximate result of the Defendant Millsap's conduct as set forth above, Plaintiff GARY GATES has suffered physical pain and mental anguish. Defendant Millsap intentionally or knowingly caused physical contact with Plaintiff Gary Gates that Millsap knew or should reasonably have believed Plaintiff would regard as offensive or provocative. Millsap's conduct was encouraged by Defendant CPS. At all times described above, Defendant Millsap was acting in the course and scope of his duties with the Fort Bend County Sheriff's Department.

151.   Defendant Millsap's conduct, when viewed objectively from the standpoint of the Defendant at the time it occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the Plaintiff, and the Defendant proceeded with the conscious indifference to the rights, safety, or welfare of Plaintiff GARY GATES despite the Defendant's actual, subjective awareness of the risk involved.

## Count # 9 - Invasion of Privacy (Intrusion on Seclusion) and § 1983 Violation of Zone of Privacy Protected by the United States Constitution Committed by Governmental Agent

152.   Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

153.   As a direct and proximate result of Defendants CPS, Chapmond, Sheehan, Polasek, Odin, Russell, Matthews, Miller, Davis, Haywood, Ramirez, Millsap, Chapman, Carillo, Schafer, Lee, Pagel, Wright, Fort Bend County and the Fort Bend County Sheriff's Department's unjustified and unlawful invasion of Plaintiffs' privacy, Plaintiffs suffered loss of privacy as well as the private use of their residence. Furthermore, Plaintiffs have suffered humiliation, embarrassment, fear, frustration, and general mental

anguish, and in all reasonable likelihood they will continue to do so for a long time in the future.

154.    Plaintiffs have suffered actual losses and actual damages as a direct and proximate result of the Defendants' cruel and wrongful invasion of their privacy described above in a sum within the jurisdictional limits of the Court and for which Plaintiffs sue.

155.    Defendants' conduct constituted a fraudulent and malicious violation of Plaintiffs' right to privacy. Plaintiffs, therefore, are entitled to recover exemplary damages. Accordingly, Plaintiffs sue for exemplary damages in a sum within the jurisdictional limits of this Court.

156.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 10 - Negligence

157.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

### (A) LCISD:

158.    Defendants LCISD, Vogelsang, O'Neal, Brown, and Kleine owed Plaintiffs a duty to exercise reasonable care in making representations to and in ascertaining the accuracy of information given to CPS. Defendants breached that duty by negligently making allegations to CPS that were clearly false and/or grossly erroneous, as their personal knowledge and records in their possession at that time made clear.

159.    As the direct and proximate result of Defendants' conduct in negligently making allegations to CPS that were clearly false and/or erroneous, all in breach of the duty owed by Defendants to Plaintiffs, Plaintiffs suffered severe mental anguish, loss of liberty, support and consortium, emotional distress, and costs of litigation to preserve parental rights.

160.    Defendants' conduct in negligently making allegations to CPS that were clearly false was malicious, in that, when viewed objectively from the standpoint of Defendants at the time of the act or omission, the conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and in that Defendants had actual, subjective awareness of the risk involved, but, nevertheless, proceeded with conscious indifference to the rights, safety, or welfare of others.

161.    LCISD, Vogelsang, O'Neal, Brown, and Kleine are liable for damages proximately caused to Plaintiffs by the conduct of Defendants, in that LCISD was the employer of Defendants on the date that Defendants negligently injured Plaintiffs, as alleged above, and was acting within the course and scope of that employment when the injury occurred.

**(B) CPS:**

162.    Defendant CPS was negligent in the manner in which it placed the Plaintiff children with foster caregivers. CPS had a duty to insure that the children were placed into comfortable, appropriate, safe environments. None of the children were so placed. Four children were told they would never go back to their parents. CPS apparently either did not advise Travis' foster care-givers of his condition, or the care-givers deliberately ignored it, allowing him to engorge himself with food. Sarah Gates was returned to her parents with soiled undergarments, greasy hair, and body odor. Andy and Cassie Gates were actually put into day care centers by their foster care-givers. Will and George were placed in an environment laden with second-hand smoke with a "screaming witch." And four children were placed in a house that was broken into and burglarized while they were there.

163.    CPS' breach of their duty to Plaintiffs was the proximate cause of extreme trauma, emotional distress and mental anguish for the entire Gates family. Damages will be determined by a jury. Because this action by CPS showed reckless indifference by CPS, Plaintiffs seek punitive damages for this negligence.

## Count 11 – False Imprisonment

164.     Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

165.     Defendant Arthur Chapman, a Fort Bend County Sheriff and others, willfully, improperly, and unjustifiably detained, at various times, Plaintiff Gary Gates, Melissa Gates, and the children in a room in their home. At the time, Defendants had no legal authority for such detention, even though they were acting within the scope of their employment. This detention was done with malice and/or fraud. As a result of the detention, Plaintiffs Mr. and Mrs. Gates were frightened for themselves and their children, embarrassed and humiliated in front of their pastor, friends, and family. Defendant Virginia Schafer, also a Fort Bend County Sheriff's deputy, willfully, improperly, and unjustifiably detained Plaintiff Melissa Gates, with no legal authority, without consent, within the scope of her employment, and with the same result. Defendant Sergeant Sam Millsap, also a Fort Bend County Deputy Sheriff, willfully, improperly, and unjustifiably detained the 11 Plaintiff children in the police jail wagon, without consent or legal authority, and within the scope of his employment. As a result, the children were frightened and suffered extreme emotional distress. Millsap was motivated by malice.

166.     The false imprisonment by Defendants was the proximate cause of damages to Plaintiffs. Plaintiffs also seek exemplary damages against Defendants involved in the false imprisonment.

## Count # 12 - Abuse of Civil Process Under 42 U.S.C. § 1983

167.     Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

168.     Defendants Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez, acting

individually or together and in conspiracy, caused the civil charges against Plaintiffs as set forth above to issue against Plaintiffs and assisted in the prosecution of said charges.

169.     Defendants were motivated in the pursuit of civil charges against Plaintiffs not by a belief that the charges had any factual or legal merit or that probable cause for their issuance existed, but for improper, illegal and unconstitutional purposes, to wit:

     a.     Defendants sought to protect themselves from civil and/or criminal liability for the unlawful treatment of Plaintiffs as set forth above, by charging Plaintiffs with causes of action which, if proven, would arguably have demonstrated the justification for the treatment of Plaintiffs; and/or

     b.     Defendants sought to collect monies from Texas State and/or federal agencies in relation to the taking of the Plaintiffs' children, placing said children in foster care, and later placing said children for adoption; and/or

     c.     Defendants strongly resented the fact that Mr. and Mrs. Gates stood up to them; and/or

     d.     Defendants were consumed with their own power agenda; and/or

     e.     Defendants did not approve of Mr. and Mrs. Gates' religious beliefs; and/or

     f.     Defendants did not approve of what was eventually confirmed as appropriate discipline of the children by the Gates; and/or

     g.     Defendants sought to hide and/or justify the systemic and actual destruction of crucial evidence.

170.    Defendants falsified their official reports and offered perjured testimony at hearings of causes of action against Plaintiffs in an attempt to secure rulings against Plaintiffs. Defendants also destroyed evidence. Further, Defendants routinely disregard statutory requirements for gathering evidence.

171.    The conduct of Defendants as set forth above clearly violated Plaintiffs' fundamental right to be free of unreasonable and unlawful seizure, secured by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

172.    The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

173.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 13 – Violation of Federally Protected Rights by Fort Bend Child Advocates, Inc.

174.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

175.    Defendant Ft. Bend Child Advocates, Inc. ("Child Advocates") acts as an investigative arm or tool of Defendant CPS and Defendant Fort Bend County District Attorney's office. Child Advocates and the CPS prosecutors from the District Attorney's office share a common facility. All of the CPS video "interviews" are done next to the CPS prosecutor's offices. The video library is also kept in the same facility. Child Advocates and the CPS prosecutors share the same lobby, receptionist, restrooms and parking lot. Thus, under 42 U.S.C. § 1983, Child Advocates is a "private actor" engaged in state action within the meaning of the Fourteenth Amendment under color of law, and this Defendant is therefore liable, under § 1983, for violations of protected civil rights.

176.   When Defendant Child Advocates interrogated and video-taped Plaintiff Travis Gates because of a baggie attached to his shirt, presumably at the request of Defendant CPS, they violated his right to be protected from unlawful search and seizure, as well as his right to not be deprived of his liberty without due process of law. The same holds true for what Child Advocates did to Alexis Gates as a result of a small contusion on her cheek. When a female interrogator from Defendant Child Advocates, at the request of Defendant CPS, interrogated Plaintiffs Marcus Gates (age 5) and Derodrick Gates (age 12) about sexually explicit matters, using offensive materials, based on a fraudulently-obtained order resulting from a small bruise on someone's face, they violated the boys' federally protected rights. The violation of these rights are the proximate cause of mental anguish, trauma, and emotional distress to the children and their family.

177.   If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 14 – Conspiracy

178.   Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

179.   Defendants Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, Laura Ramirez, Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, Scott Pagel, John F. Healey, Jr., Kathryn Holton, Marsha Vogelsang, Judy O'Neal, Cynthia Brown, Karen Kleine, Linda Shultz, Paula Gibson, Kersey Smith, and Bessie Smith, acting in their individual and official capacities and under color of law, having conspired together and with others, reached a mutual understanding and acted to undertake a course of conduct that violated Plaintiffs' civil rights, to wit:

    a.   Defendants Linda Shultz, Paula Gibson, Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel

Miller, Erika Davis, Sherrece Haywood, and Laura Ramirez agreed and acted intentionally to interrogate and video-tape Plaintiffs Travis, Alexis, Marcus, and Derodrick Gates without due process of law or probable cause, thus unreasonably depriving them of their liberty without due process of law.

b.. Defendants Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, Laura Ramirez Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, and Scott Pagel agreed and acted intentionally to forcibly remove 13 children from their home without any probable cause, warrants, orders, or other due process of law. This was an unreasonable search and seizure and improper deprivation of liberty.

c. Defendants Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, Laura Ramirez, John F. Healey, Jr., and Kathryn Holton agreed and acted intentionally to file a petition to prevent Plaintiffs Gary and Melissa Gates from getting their children returned after they were snatched by CPS. No reasonable basis in fact existed for this extraordinary action, or the seven months of litigation that followed as Defendants CPS and Fort Bend County District Attorney's office tried to terminate Mr. and Mrs. Gates' parental rights to their children.

d. Defendants Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Erika Davis, Sherrece Haywood, Laura Ramirez and Kersey and Bessie Smith agreed and acted intentionally to keep Plaintiffs Scott, Derodrick, Travis and Raquel Gates from being returned to their parents. This was a violation of due process.

41

180.    The above conspiracies are the proximate cause of mental anguish, emotional distress, and legal expenses for Plaintiffs.

181.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count # 15 - Violation of State Constitution**

182.    Plaintiffs incorporate by reference paragraphs 35-97 as though fully set forth at length herein.

183.    By their actions described above, Defendants TDPRS, Thomas Chapmond, Karen Sheehan, Jerry Polasek, Amy Odin, Sandra Russell, Lisa Matthews, Laurel Miller, Laura Ramirez, Fort Bend County, Fort Bend County Sheriff's Department, Milton Wright, Sam Millsap, Arthur Chapman, Carlos Carrillo, Virginia Schafer, Ken Lee, Scott Pagel, Fort Bend County District Attorney's office, John F. Healey, Jr., and Kathryn Holton violated Sections 9 and 19 of the Texas Constitution.

**Jury Requested**

184.    A jury trial is requested on all issues.

**Damages**

185.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered the following injuries and damages:

        a.    Lost earnings.

        b.    Damage to reputation in the past and in the future.

        c.    Mental anguish in the past and in the future.

        d.    Physical pain and emotional distress.

        e.    Exemplary damages.

42

      f.       Costs and fees related to  litigation by State of Texas to terminate Plaintiffs' parental rights.

## **Attorney's Fees**

186.    Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to reasonable and necessary attorney's fees for the preparation and trial of this case and various stages of appeal, if any, including additional attorney's fees in the event it is necessary to pursue the collection of any judgments.

## **Prayer for Relief**

187.    For these reasons, Plaintiffs asks for judgment against Defendants for the following:

      a.       Actual damages,

      b.       Exemplary damages,

      c.       Reasonable and necessary attorney's fees,

      d.       Prejudgment and Postjudgment interest,

      e.       Costs of suit,

      f.       Costs of defending appeal,

      g.       Such other and further relief that this Court may deem appropriate and just.

188.    Plaintiffs further ask the Court for the following relief against the Texas Department of Protective and Regulatory Services, Lamar Consolidated Independent School District, Fort Bend County, Fort Bend County District Attorney's Office, Fort Bend County Sheriff's Department, and Ft. Bend County Child Advocates, Inc., in addition to the requested relief hereinabove against said Defendants:

a.    A declaratory judgment that the policies, practices, and acts complained of

       herein are illegal and unconstitutional.

b.    A permanent injunction enjoining said Defendants from engaging in the

       practice complained of.

c.    Such other and further relief that this Court may deem appropriate and

       just.

                              Respectfully Submitted,

                              HOOVER & HARGER, P.C.


                              By: _William H. Harger_
                              WILLIAM G. HARGER
                              Texas Bar No.: 00793898
                              Southern Dist. Of Texas Bar No.: 20171
                              12946 Dairy Ashford, Suite 200
                              Sugar Land, Texas 77478
                              Tel: (281) 340-9600
                              Fax: (281) 340-9601

                              ATTORNEY IN CHARGE FOR
                              PLAINTIFFS

Of Counsel:
CHRIS BRANSON
Attorney at Law
Texas Bar No: 24009914
Southern Dist. of Texas Bar No: 24128
2205 Avenue I, #117
Rosenberg, Texas 77471
Tel.:    (713) 957-8863
Fax:    (713) 688-4537